UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-14259-CIV-MOORE/LYNCH

JOHN F. JOCHEM,

    Plaintiff,

v.

POLYMEDICA CORP., LIBERTY MEDICAL SUPPLY,
INC., LIBERTY HEALTHCARE GROUP, INC.,
JAMES FOXWORTH, STEPHEN C. FARRELL, AND
JONATHAN STARR,

    Defendants.

_____/



FILED by _____ D.C.

JUL 16 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

### REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DE 76), PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT II (DE 79), AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I AND III (DE 81)

**THIS CAUSE** comes before this Court upon the above Motions. Having reviewed the Motions, the Responses and Replies thereto, their various attachments, the respective Statements of Disputed and Undisputed Material Facts, and the parties' Joint Pre-Trial Stipulation, this Court recommends as follows:

### BACKGROUND

1.    The Plaintiff brings suit for breach of employment contract, unpaid overtime, and retaliatory termination of employment. The Plaintiff brings suit against Liberty Medical Supply, Inc., Liberty Healthcare Group, Inc., (together "Liberty"), and their parent company, PolyMedica Corp. He also

brings suit against the Liberty companies' executive officers, Messrs. Foxworth (head of Human Resources), Starr (CFO), and Farrell (President). Who served as the Plaintiff's employer and at what times remain in general dispute although the parties do agree to the extent that Liberty Medical Supply, Inc. and Liberty Healthcare Group, Inc. were employers. Since the parties do not actually brief the issue, this Court is unable to render a definitive ruling, however.

2.    The Liberty family of companies sell medical testing supplies and medication, such as for diabetes, primarily to seniors. Liberty sells these products over the telephone through Liberty's Patient Enrollment Department both by answering customer inquiries and by soliciting patients listed by other companies. The Liberty corporate Defendants concede that they are subject to the Fair Labor Standards Act and participate in interstate commerce. The Defendants moreover concede personal and subject matter jurisdiction.

3.    The Plaintiff worked as a telephone salesman in the Patient Enrollment Department from August 1999 to February 2005. The exception to this was the half year between July 2003 and January 2004 when he worked as an Acquisition Specialist Representative ("ASR") in the provisional HME Acquisition Program. The parties disagree on what were the HME Program's goals, an ASR's responsibilities, and an ASR's terms of

compensation. Generally speaking the HME Program was created for the purpose of acquiring patient lists and assets from other medical supply providers as a means to expand Liberty's own customer base. Evidently the terms of compensation were never fully formalized although Liberty's then CEO and the program's creator, Keith Trowbridge, did initial a draft plan and placed it into circulation. The Defendants stress how the plan was entitled a proposal, but there is no dispute that the Defendants actually used this plan for calculating ASR pay. The plan set forth a compensation structure whereby ASR's were paid a draw on commissions, although it does not state the method of calculating these underlying commissions. ASR's were also paid a bonus based on a graduated scale. For every incremental increase in "new customer enrollment from successfully completed acquisitions", an ASR received a pre-determined bonus amount. Liberty paid 25% of the bonus upon "a fully executed letter of intent between both parties" and later paid the remaining 75% balance "upon the execution of the purchase agreement between both parties."

4.    Beginning September 14, 2004 the Plaintiff wrote a series of letters to the Defendants complaining of his ASR compensation. Through these letters the Plaintiff explains that his efforts resulted in the acquisition of MaxWell Medical, a company with an especially large number of customers. The Plaintiff protested what he saw as an irregularity in how Liberty

was calculating his bonus for the acquisition. He explained that notwithstanding the plan's language to the contrary, Liberty paid the ASR's for the number of customers listed in the purchase agreements as opposed to the number of customers Liberty subsequently enrolled. In any event the Plaintiff was never paid for this lead. The Plaintiff asked the Defendants to adhere to this established practice with respect to the MaxWell Medical account. The Plaintiff later added three Florida companies, including National Diabetic Assistance Corp., to his grievance upon learning Liberty had acquired them, as well.

5.    On February 13, 2005 the Plaintiff wrote his tenth letter to the Defendants (specifically, to Mr. Starr), this time expressing frustration with the lack of resolution. Therein the Plaintiff contemplated the possible need for judicial involvement, and albeit expressed in a moderated tone of voice, he suggested pursuing pre-lawsuit mediation as a means to avoid negative publicity and mentioning the prominence of his family name in the local community.

6.    The Defendants responded decisively to this last correspondence. At a February 22nd, 2005 meeting Mr. Starr presented the Plaintiff a letter announcing his termination "effective immediately" citing his threats of potential litigation and publicity, behavior which Liberty regarded as intolerable. That same day Liberty paid him his final pay,

returned his personal belongings, and took back his access badge. The Plaintiff performed no further work for the Defendants.

7. The Plaintiff hired a lawyer after his termination and then agreed to participate in an exit interview. The Plaintiff attended the interview on March 3, 2005, accompanied by his counsel. At this exit interview the Plaintiff raised for the first time a claim for overtime pay. The interview minute sheet notes a termination date of February 22, 2005, the same date as Mr. Starr's letter.

8. The above serves as the factual predicate to Counts I and III of the Plaintiff's Complaint. For Count I the Plaintiff brings suit against Liberty Healthcare Group, Inc. for breach of employment contract, and more specifically, the failure to compensate him fully for services he rendered as an ASR. For Count III the Plaintiff brings suit against PolyMedica Corp., Liberty Healthcare Group, Inc., and Mr. Starr for wrongful termination in retaliation for asserting his FLSA wage rights.

9. For his remaining cause of action, Count II, the Plaintiff brings suit against all of the Defendants jointly and severally for their failure to pay him for unpaid regular and overtime wages. Count II is brought pursuant to the Fair Labor Standards Act. This failure to pay full compensation stems from two of the Defendants' commonly applied pay practices. The first, referred to as the "lunch break rule", automatically deducted 30

minutes from each workday for lunch and for breaks of 16 to 29 minutes' duration. Although the Employee Handbook eventually was updated to include reference to the lunch break rule, it does not appear that the related break time rule was ever formalized in writing. The second was the Defendants' exclusion of incentive pay from overtime pay calculations, a practice which had the effect of further artificially depressing the amount of overtime paid. There is no need to detail these two pay practices here, however, since they already have been subject of prior analyses. In prior Reports and Recommendations, found at DE 661 in the principal case of Ealy-Simon v. Liberty Medical Supply, Inc., Case No. 05-14059-CIV-MOORE/LYNCH and at DE 73 in its companion case of Allen v. Liberty Medical Supply, Inc., Case No. 06-14097-CIV-MOORE/LYNCH, this Court reviewed the facts and circumstances of these pay practices, the resulting overtime miscalculations, and the FLSA's requirements. To this extent the issues presented in the instant Jochem case are the same, and consequently, this Report and Recommendation draws from those earlier rulings.

## DISCUSSION

Applying the same standard of review as used in those previous rulings, the Plaintiff and the Defendants, as the respective moving parties, are entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. See Fed. R. Civ. P.

56, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 578 (1986). The facts, and any reasonable inferences drawn therefrom, are to be viewed in the light most favorable to the non-moving, opposing party, with any doubt resolved in the non-movant's favor. <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970). Notwithstanding this presumption, the opposing parties must come forward with facts showing a genuine issue for trial sufficient to sustain a jury verdict in their favor. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). In short, the opposing parties must offer, and not just plead, specific contrary facts; the proffered evidence must be significantly probative and not based on mere assertion or be merely colorable. <u>See</u> Fed. R. Civ. P. 56(e), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). <u>See</u> <u>also</u>, <u>Castleberry v. Goldome Credit Corp.</u>, 408 F.3d 773, 785-86 (11th Cir. 2005), <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993), <u>Vardaq v. Motorola, Inc.</u>, 264 F.Supp.2d 1056, 1058 (S.D. Fla. 2003). In this way, Rule 56 serves to eliminate the delay and expense to the parties and to the Court of an unnecessary trial.

This Court considers the Plaintiff's primary contention — breach of contract — first. The three fundamental elements of a breach of contract action are a valid contract, a material breach, and damages. <u>See</u> <u>Beck v. Lazard Freres & Co., LLC</u>, 175 F.3d 913, 914 (11th Cir. 1999). This Court discerns no serious

dispute that some sort of agreement existed governing the Plaintiff's participation in the HME Program as an ASR. The Defendants do not dispute that Liberty Healthcare Group, Inc., invited the Plaintiff (and three other top performing sales representatives) to participate in the newly formed program whose essential purpose was to acquire lists of potential patient/ customers from companies in the same line of business as Liberty. The Defendants do not dispute that they and the ASR's discussed compensation terms and that the ASR's sought to maintain their usual income levels. The Defendants do not dispute that the creator of the HME Program, Mr. Trowbridge, initialed a compensation plan and importantly that they paid the Plaintiff pursuant to it. The Defendants do not dispute that in January 2004, upon Mr. Trowbridge's sudden departure from Liberty, the HME Program was disbanded. While the Defendants do raise some vague objections to the plan's validity, they do not specifically counter that it played a role in governing their participation in the program. Lastly they do not deny that Liberty Healthcare Group, Inc., is the party ultimately responsible for the HME Program; they certainly point to no other.

This brings the analysis around to whether Liberty Healthcare Group, Inc. breached the terms of the compensation plan. (For sake of simplicity this Court will continue reference to the "Defendants", despite finding Liberty Healthcare Group,

Inc., ultimately responsible for the program, since the Defendants collectively are arguing the Motion.) This analysis necessarily involves what the plan's terms were, the point of primary contention between the parties. It is well settled that when construing a contract, courts should give effect to its terms' plain meaning. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 132-33 (Fla. 2000). Here, the plan's keystone provision is "to generate acquisition activity", language which defines what an ASR must do to earn a bonus. This language obviously is quite generalized, a fact upon which the Plaintiff relies to advance his construction. The Plaintiff argues that the plan simply requires some degree of engagement in acquisition activity. The program director distributed a "hunt list" of companies, and it was the Plaintiff's job as an ASR to research which of those listed companies were eligible for "prospecting" and to pass the leads along to the back office for further development if they were too large for him to complete on his own. Lastly the Plaintiff says that upon the program's discontinuation, Peter McKenzie, Mr. Trowbridge's successor, promised him continued compensation for past work and for all leads. Under this construction, so long as he placed a company in the acquisition pipeline before the HME Program was disbanded, he should be entitled to bonus compensation.

The Defendants counter that generating acquisition activity

means more than merely developing leads or making first contact. They deny that the hunt list conveyed carte blanche, and they insist they instructed the ASR's to pursue only smaller companies, i.e., those of 3,000 or fewer potential customers, for which the ASR's could handle the paperwork (letters of intent and purchase agreements) themselves. ASR's were never supposed to prospect the larger companies. Furthermore the Defendants import a sense of reasonableness into the governing provision, and they regard the standard applied to real estate commissions a better measure of what sort of acquisition activity is necessary to earn compensation. Citing to the cases of Rotemi Realty, Inc. v. Act Realty Co., Inc., 911 So.2d 1181, 1188-89 (Fla. 2005), Stadler Commercial Real Estate Servs., Inc. v. Indus. Waste Servs., Inc., 519 So.2d 739, 740 (Fla. 3rd DCA 1988), Edwards v. Brandon Realty, Inc., 497 So.2d 269, 271 (Fla. 2nd DCA 1986), and Scott v. Downey, 314 So.2d 16, 17 (Fla. 4th DCA 1975), the Defendants argue that something more than incidental involvement is required. Rather an ASR, like a broker, must have initiated negotiations through some positive act, brought the Defendants and the company together, and remained involved in their negotiations.

The six acquisitions for which the Plaintiff seeks compensation — MaxWell Medical, National Diabetic Assistance Corp. ("NDAC"), Diabetic Assistance Program, Associated Diabetic,

National Diabetic Pharmacies ("NDP"), and Marlin Medical —
illustrate how the parties' interpretations differ. The
Defendants contend that the Plaintiff's involvement in these
acquisitions was either minimal, e.g., simply getting a
representative's name and phone number, or redundant to
negotiations Liberty was pursuing already. The Plaintiff retorts
that his involvement was more substantial, possibly substantial
enough even under the Defendants' theory. With respect to NDAC,
for example, the Defendants characterize the Plaintiff's three
unsolicited form letters, phone calls, postcards, and personal
meeting with Steven Rotwein, NDAC's principal, as "limited", and
further downplay that meeting by describing it as counter-
productive. What the Defendants omit, however, is that Liberty
asked the Plaintiff to attend the meeting in the place of two of
its officers. And while Mr. Rotwein says the Plaintiff's
apparently disingenuous answer to a particular question (as well
as the then too low purchase price) turned him off, neither do
the Defendants address why that subject of inquiry never arose
during Liberty's subsequent negotiations. The Plaintiff adds that
since Mr. Rotwein maintains a business relationship with Liberty,
his testimony is biased. Similarly with respect to NDP the
Defendants say the Plaintiff's involvement was limited to a
chance encounter with David Dixon, its principal, at a trade show
in Salt Lake City, but they omit that they sent the Plaintiff

there on an all-expenses-paid trip for the very purpose of developing acquisition leads. Lastly the Defendants contend that these acquisitions were too large for ASR involvement in the first place.

Both parties' constructions of the contract are reasonable. From the Plaintiff's viewpoint it is reasonable to see how the plan's lack of specificity contemplated the ASR's exercise of free reign in acquiring as many new customer lists as possible. From the Defendants' viewpoint it is also reasonable to have expected some minimal degree of involvement in bringing about an acquisition. If the acquisition was in all practical respects the fruit of another's labor, then no bonus should be owing, and taking the Plaintiff's interpretation to its extreme, he would be entitled to a bonus for any minimum contact, mailing just one postcard for example, so long as he was the first to make contact. The provision is therefore ambiguous. See Arriaga v. Fla. Pacific Farms, LLC, 305 F.3d 1228, 1246 (11th Cir. 2002).

Ordinarily a court may resolve contractual ambiguity as a matter of law by inferring meaning, see Arriaga, 305 F.3d at 1246, Bivens Gardens Office Bldg, Inc. v. Barnett Banks of Fla., Inc., 140 F.3d 898, 911 (11th Cir. 1998), Cox v. CSX Intermodal, Inc., 732 So.2d 1092 (Fla. 1st DCA 1999), but with so much in dispute, this case presents no such opportunity: The Defendants seek to bring in extrinsic evidence to shed light on the parties'

intent, but that evidence is itself subject of dispute. Another
of the plan's key provisions — whether a customer must actually
enroll with Liberty before it counts towards a bonus — lends no
helpful insight since it concerns an issue (timing) distinct from
how an underlying customer list was to be acquired in the first
place. Evidence concerning the parties' pattern and practice,
e.g., how the parties actually acted under the plan and what
acquisition efforts did lead to bonus payments, might be highly
probative but is little explored in these Motions. Indeed neither
party provides a substantive analysis under contract law, thereby
making this Court's task of interpreting the plan even more
difficult. While this Court does rule as a matter of law that Mr.
Trowbridge's compensation plan is the governing contract for
calculating bonus payments, this Court is unable to resolve the
ambiguity of the disputed provision. Consequently the remainder
of the Plaintiff's Motion for Summary Judgment as to Count I
should be denied. For the same reasons the Defendants' Motion for
Summary Judgment regarding the NDP and NDAC acquisitions should
be denied.

Count III concerns retaliatory termination for the
Plaintiff's assertion of his FLSA rights. The FLSA makes it
unlawful for any person:

> to discharge or in any other manner discriminate
> against any employee because such employee has filed
> any complaint or instituted or caused to be instituted
> any proceeding under or related to this chapter . . . .

Page 13 of 27

29 U.S.C. § 215(a)(3). Case law interprets this statute to protect employees from retaliation for asserting rights under the statute. In order to prove a prima face case of FLSA retaliation the Plaintiff therefore must prove participation "in activity protected under the act"; subsequent adverse action by the employer; and a causal connection between his protected activity and the adverse employment action. See Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000). "In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights." Id. at 1343 (citing Reich v. Davis, 50 F.3d 962, 965-66 (11th Cir. 1995)).

It is true that in his correspondence with the Defendants the Plaintiff complained of inadequate pay, but this alone does not pull him within the scope of the FLSA. The overarching thrust of the Plaintiff's letters — and he expressed his concerns in very specific language — was full bonus compensation under the HME Program's compensation plan. The nature of his particular grievance can be described in one of two ways — a claim for straight or "gap" time or a claim for payment under a contract — neither of which invokes the FLSA. See Monahan v. County of Chesterfield, Va., 95 F.3d 1263 (4th Cir. 1996) (noting that the central themes of the FLSA are minimum wage and overtime) and Green v. Dallas County Sch., 2005 WL 1630032, *3 (N.D. Tex. 2005) (citing additional case law). It is important to note that the

Plaintiff never actually mentioned FLSA-type wages, and this fact defeats the Plaintiff's claim for relief. See Florida-Kaclik v. SSPC, 124 Fed.Appx. 707 (3rd Cir. 2005), Hagan v. Echostar Satellite LLC, 2007 WL 543441, *5 (S.D. Tex. 2007), and Slater v. Verizon Commc'ns, Inc., 2005 WL 488676, *8 (D.N.H. 2005). Even the case cited by the Plaintiff, McKenzie v. Renberg's Inc., 94 F.3d 1478 (10th Cir. 1996), involves the situation of an employee directly concerned about her employer's FLSA compliance. That full bonus compensation may have led to an increase in overtime pay is irrelevant since overtime was never subject of the Plaintiff's complaints.

The Plaintiff first articulated a claim for FLSA wages at his exit interview, what he contends to be the proper marker of his termination date. He bases his contention on the Employee Handbook which "requires all employees to participate in an exit interview on or before their effective date of termination." This language does not indicate that the date of the exit interview is the effective date of termination, however. The remainder of the paragraph suggests instead that the purpose of the exit interview is to handle post-separation matters. But even construing this point in the Plaintiff's favor would not change the analysis because the reason for the exit interview in the first place was never an FLSA-related wage claim.

That the Defendants failed to follow their own termination

procedures is likewise irrelevant. It is true that Liberty's
corporate officers used the opportunity to send a strong message
to the overall employee population. Had they fired the Plaintiff
in order to dissuade others from pursuing their wage claims,
including FLSA-based wage claims, the Plaintiff might state a
better theory. Such is not the case here. The subject matter of
both the termination letter and the email that gave rise to the
letter is limited to the Plaintiff's bonus grievances.
Consequently summary judgment should be granted in the
Defendants' favor on Count III of the Plaintiff's Complaint.

Of course the Plaintiff claims FLSA wages now, as expressed
in Count II of his Complaint. The present Motions present the
third evolution of the issues concerning the Defendants'
compliance, and in this way the instant analysis serves as a
supplement to the Ealy-Simon and Allen analyses. Key to the
Defendants' argument is a distinction between the punch times (as
recorded by their biometric "E-Time" system) and the Plaintiff's
actual work time. The other fundamental element of the
Defendants' argument is the availability of a "checks and
balances" system for voiding automatic deductions for lunch and
break times not taken. The Defendants use these premises to
create a competing picture of the FLSA claims, and one for a jury
to resolve. The flaw with the Defendants' argument, however, is
that it does not create a true dispute of fact. It instead turns

on questions of law such as waiver and burden of recordkeeping. The facts surrounding the pay practices' implementation and application illustrate how.

Despite the Liberty Medical cases' now lengthy litigation history, very little is known about the automatic deductions' genesis. The Defendants repeat that they adopted the measure in order to prevent employees from taking on-the-clock breaks. (Of note, the Defendants raise no contention that Mr. Jochem did such.) But in so doing, the Defendants shifted the burden of recordkeeping onto the employees as well as shifted the system's bias towards off-the-clock work. The Defendants do detail their "checks and balances" system for work hour corrections, but this point is similarly problematic. On a factual level the Plaintiff produces uncontroverted evidence that he was discouraged from seeking corrections, being told that the automatic deductions would stand as is. The Plaintiff also alleges in his Complaint that he had at least one day of mandatory overtime a week. On a legal level, the Defendants' argument is essentially one of waiver — faulting the Plaintiff for not contemporaneously objecting to the deductions — a defense which FLSA law does not recognize.

The Defendants draw attention to some of the Plaintiff's time entries, one twelve-hour day for example, implying that the Plaintiff must have taken a lunch break during such a long

workday. The Defendants leave unaddressed, however, whether the Plaintiff ate lunch while working, i.e., not fully relieved of his work duties, and they express no concern that the Plaintiff worked a twelve-hour workday in the first place. They do not dispute that the Plaintiff was working such long days, and they do not resolve the apparent inconsistency with policies ostensibly disfavoring overtime hours.

The Defendants moreover disavow any knowledge of the Plaintiff working through his breaks. They do so despite admitting the accuracy of their biometric punch clock system; his long work days and the requirement that his supervisor sign off on his time sheets; and his supervisor's encouragement to work through lunch breaks. With regard to this third point the Plaintiff presents uncontroverted evidence that at a meeting Peggy Bourn, his supervisor, told the Senior Vice-President of Human Resources of the importance that her workers stay during lunch when call volume was its highest and that employees have the choice to eat at their desks if they wanted to keep working. Javier Cintron, Liberty's Payroll Director, likewise acknowledged that lunch breaks were "encouraged" (as opposed to strictly enforced). And as this Court emphasized in Allen, the very nature of the Defendants' system makes it hard for them to disavow at least constructive knowledge of employee overtime hours.

The Defendants' focus on the distinction between punch times

and actual work times (which would necessitate a jury reaching findings of fact as to each punch entry) is myopic. The Defendants do not account for all the surrounding evidence that buttresses the Plaintiff's claim. The Plaintiff posits a reasonable inference of uncompensated work which the Defendants do not persuasively rebut, as <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687-88 (1946) requires. The Defendants do not persuasively reject the effect of 29 C.F.R. § 785.11 that work not requested but still suffered or permitted is compensable. That regulation expands the focus of inquiry from just the employer's work rules to include more practical considerations of whether the employer benefitted from the fruits of the employee's labor.

With respect to the second disputed pay practice — the exclusion of non-discretionary bonuses from the overtime calculations — the Defendants say only that the Plaintiff fails to cite any legal authority to support his claim. This objection is insufficient to defeat summary judgment. To begin with there is legal authority, found at 29 C.F.R. § 778.209, to support the Plaintiff's position, but more importantly, the Defendants do not deny the practice of excluding these incentive payments. Indeed, as the Plaintiff points out, the Defendants concede the practice.

This Court addresses two final liability issues. First to the extent the Plaintiff claims straight, or in FLSA parlance

"gap", time, the Plaintiff fails to plead a legal basis for recovering it. The Plaintiff limits Count II to the FLSA which does not permit the recovery of straight time, and he does not plead entitlement to it under state law. Primarily, though, the Defendants seek a summary ruling that they qualify for the "retail or service establishment" exemption, presumably for every quarter of the Plaintiff's employment as a telephone sales representative in Liberty's Patient Enrollment Department (i.e., not during the short-lived HME Acquisition Program). This exemption, found at 29 U.S.C. § 207(i), exempts a retail/service establishment employer from paying overtime to an employee whose regular rate of pay is one and one-half times the minimum wage rate and who earns "more than half his compensation for a representative period (not less than one month) [in the form of] commissions on goods or services."

The first point of inquiry is to determine whether the Defendants qualify as such an establishment. Congress no longer defines what constitutes a "retail or service establishment", but case law generally continues to adhere to the since repealed definition found at 29 U.S.C. § 213(a)(2). See Reich v. Delcorp., Inc., 3 F.3d 1181 (8th Cir. 1993), Gatto v. Mortgage Specialists of Ill., Inc., 442 F.Supp.2d 529 (N.D. Ill. 2006), Saunders v. Ace Mortgage Funding, Inc., 2007 WL 1190985 (D.Minn. 2007), Reich v. Cruises Only, Inc., 1997 WL 1507504 (M.D. Fla. 1997). That

statute defined a retail or service establishment to be an
establishment 75% of whose annual dollar volume of goods and
services (or both) sold is not for resale and is recognized as
retail sales or services in the particular industry. Department
of Labor regulations also speak on what it means to be a retail
or service establishment. Title 29 C.F.R. § 779.318(a) sets forth
the typical characteristics of such an establishment as being
one:

> which sells goods or services to the general public. It
> serves the everyday needs of the community in which it
> is located. The retail or service establishment
> performs a function . . . at the very end of the stream
> of distribution, disposing [its products and skills in
> small quantities] and does not take part in the
> manufacturing process.

Surrounding DOL regulations further expand upon this definition
as well as the "retail concept". See 29 C.F.R. §§ 779.315 through
779.322.

The Defendants rely on these definitions to make out their
claim for entitlement to the exemption, but they provide little
evidence to substantiate it. The Defendants say that an SEC Form
10-K issued by PolyMedica, Inc. on June 9, 2006 shows that
virtually all of Liberty's goods are not sold for resale, but the
Defendants omit providing this SEC filing to the Court. The
Defendants point to the deposition of Stephen Farrell who
testified that Liberty primarily sells diabetes testing supplies
and pharmaceutical drugs produced by others and sells them to

seniors on Medicare, and Liberty once also sold respiratory drugs to Medicare patients. Mr. Farrell's deposition provides no information beyond these conclusory assertions, and the surrounding deposition dialogue suggests that Liberty's sales also include items for re-sale. Depositions further suggest that up until some point in 2005 Liberty manufactured drugs and/or vitamins, although they describe the quantity as insignificant or very small.

Despite it being their burden of proof, the Defendants' argument ends there. Most notably the Defendants provide no accountings of the necessary sales figures or manufacturing activities. The Defendants provide no additional arguments such as whether their resale or manufacturing activities were de minimis to their retail activities. With the record such as it is, this Court cannot find the Defendants to be a retail establishment as a matter of law despite the general retail nature of their business. By leaving the elements of their defense unsubstantiated, the Plaintiff is able to defeat summary judgment. The Defendants leave their argument undeveloped despite this Court's observation of the same flaws in the Ealy-Simon ruling and despite being given leave (DE 106) to expand their argument in their Reply. While the foregoing weighs against finding the Defendants a retail establishment, at least as the governing regulations define it, this Court does note that in the

Page 22 of 27

Order Resolving Remaining Issues of Law and Fact (DE 726) rendered in the Ealy-Simon case, Judge Moore held certain language in Ealy-Simon's pleadings to constitute an admission of the Defendants' retail status. The same language is not found in Jochem's Complaint, but his pleadings still imply that "the named Defendant corporations are part of a common enterprise established for the purpose of providing medical supplies, products, and services to the public".

Since the Plaintiff may have conceded the Defendants' retail status, this Court proceeds to the second facet of the exemption — the nature of the Plaintiff's pay. The Plaintiff leaves uncontested that his regular rate of pay exceeds one and one-half times the minimum wage rate, but he does vigorously object to the Defendants' characterization of his incentive pay. The Plaintiff explains that Liberty paid him three different types of incentive pay: the first, referred to as "TSR/Diabetic Sales" was a percentage of the products' value sold, and the two others, referred to as "Cross Sell/Upsell(VETCO)" and "Meter", were flat fee, per item "spiffs". There is no dispute that the first, the TSR, is a traditional commission. Where the parties diverge is whether the two flat fees are also commissions. The distinction is important because if they are excluded from the calculation, then the Plaintiff's commissions never comprise more than half of his total earnings, thereby precluding exemption for all of the

quarters he worked. The Defendants cite the expansive definition advanced in the case of <u>Klinedinst v. Swift Invs., Inc.</u>, 260 F.3d 1251 (11th Cir. 2001) that a "commission" is not limited to just a percentage of sale proceeds but can include a functionally equivalent fee. However Judge Moore rejected the Defendants' argument in his Order Resolving Remaining Issues of Law and Fact (DE 726) rendered in the <u>Ealy-Simon</u> case. The Defendants' claim to the retail establishment exemption therefore fails as a matter of law.

The foregoing establishes the Defendants' liability — that the two complained of pay practices resulted in underpayment of overtime — and hence violated the FLSA. With respect to damages, this Court discusses first the applicable statute of limitations and whether the Plaintiff should be able to recover for two or three years' unpaid overtime. There is also the question of entitlement to liquidated damages. Despite two prior contrary rulings, the Defendants raise no new arguments or facts that would persuade against a summary ruling. The Defendants assert that the topic of FLSA compliance was the subject of much discussion amongst their senior executives who "seriously considered it internally over a long period of time and reviewed the applicable regulations", but the Defendants still have no fruits of these deliberations to show. Javier Cintron, Liberty's Payroll Director, even denied having considered FLSA compliance

at the time of E-Time's implementation. The facts and circumstances regarding the disputed pay practices are well-established and weigh in the Plaintiff's favor. Where the record does lack details, e.g., concerning the genesis of the automatic break deduction rule or the implementation of E-Time, the resulting ambiguities only weigh in the Plaintiff's favor more.

Lastly the Defendants object to the Plaintiff's damages calculations. This Court notes that the computation of other Liberty Medical plaintiffs' damages is currently pending before the Court. Since the outcome of that process necessarily will impact the computation of the instant Plaintiff's damages, that is, by establishing the correct mathematical formula to use, the most practical course of action is to deny this part of the Plaintiff's Motion without prejudice to raising the matter once he is able to apply the Ealy-Simon ruling to the circumstances of this case.

## CONCLUSION

Many of the issues presented appear at first blush to be fact-intensive but nevertheless turn on questions of law; still others lack a sufficient factual predicate to compel a summary ruling. In some instances, such as with the Defendants' FLSA compliance and willfulness, the record is well-developed with the Defendants failing to rebut salient points. In some instances, notably the charge of retaliatory termination and the retail

exemption, the parties fail to substantiate their claims. And in some instances, such as the breach of contract claim, both fail to develop arguments compelling summary judgment in their favor. In the end analysis few of the parties' claims had both the factual and legal predicates necessary to warrant a full summary ruling.

**ACCORDINGLY**, this Court recommends to the District Court that:

(I)   The Defendants' Motion for Partial Summary Judgment (DE 76) should be **GRANTED** as to Count III for retaliatory termination but be **DENIED** as to Count I for breach of contract and as to their Affirmative Defense of FLSA exemption.

(II)  The Plaintiff's Motion for Partial Summary Judgment (DE 79) should be **GRANTED, in part,** as to Count II. This Court finds that the Defendants' practices of automatically deducting break times and of excluding incentive pay from overtime pay rate calculations both resulted in the underpayment of overtime pay in violation of the FLSA. The Defendants' violation was willful. Consequently the Plaintiff is entitled to his unpaid overtime for a period of three years' time and to an equal amount in liquidated damages. His Motion should be **DENIED** to the extent he seeks a damages award at this time.

(III) The Plaintiff's Motion for Partial Summary Judgment (DE 81) should be **GRANTED, in part,** as to Count I to the extent that the Compensation Structure (Proposed) memorandum is the parties' governing contract for purposes of determining compensation in the HME Acquisition Program and for which Liberty Healthcare Group, Inc. is ultimately liable. His Motion should be **DENIED** otherwise as to Count I and as to Count III.

As such, Count III falls away completely, and the Defendants are found to be in willful noncompliance with the FLSA's overtime

provisions under Count II. The issues which remain pending are Count I and FLSA damages under Count II.

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this _____ day of July, 2007.

_____
FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc:  Hon. K. Michael Moore
     Haas A. Hatic, Esq.
     Mark A. Cullen, Esq.